



## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA; THE STATES OF CALIFORNIA, DELAWARE FLORIDA, GEORGIA, HAWAII, ILLI-NOIS, INDIANA MICHIGAN, MASSA-CHUSETTS, NEVADA, NEW HAMP-SHIRE, NEW MEXICO, NEW YORK, OKLAHOMA, TENNESSEE, VIRGINIA; AND THE DISTRICT OF COLUMBIA EX REL. [UNDER SEAL], | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| [UNDER SEAL], | ) |
| Defendant. | ) |

Civil Action No. _____

**08   0287**

COMPLAINT

**FILED**

JAN 03 2008

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

# FILED UNDER SEAL
## PURSUANT TO
## 31 U.S.C. §§3729 et. seq.



$350

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA; THE ) | Civil Action No. __08 0287__ |
| STATES OF CALIFORNIA, DELAWARE ) | |
| FLORIDA, GEORGIA, HAWAII, ILLI- ) | |
| NOIS, INDIANA MICHIGAN, MASSA- ) | |
| CHUSETTS, NEVADA, NEW HAMP- ) | COMPLAINT FOR VIOLATIONS |
| SHIRE, NEW MEXICO, NEW YORK, ) | OF THE FEDERAL FALSE CLAIMS ACT [31 |
| OKLAHOMA, TENNESSEE, VIRGINIA; ) | U.S.C. §3729 et seq.]; CALIFORNIA FALSE |
| AND THE DISTRICT OF COLUMBIA ) | CLAIMS ACT [Cal. Govt Code §12650 et seq.]; |
| EX REL. BRUCE BOISE, ) | DELAWARE FALSE CLAIMS AND FALSE |
| Plaintiffs, ) | REPORTING ACT [6 Del. C. §1201]; FLOR- |
| ) | IDA FALSE CLAIMS ACT [Fla. Stat. Ann. |
| v. ) | §68.081 et seq.]; GEORGIA FALSE MEDI- |
| ) | CAID CLAIMS ACT [Ga. Code Ann. § 49-4- |
| CEPHALON, INC., ) | 168 et seq.]; HAWAII FALSE CLAIMS ACT |
| Defendant. ) | [Haw. Rev. Stat. §661-21 et seq.]; ILLINOIS |

WHISTLE BLOWER REWARD AND PROTECTION ACT [740 Ill. Comp. Stat.
§175 et seq.]; INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTEC-
TION ACT [Ind. Code Ann. § 5-11-5.5-1 et seq.]; MASSACHUSETTS FALSE
CLAIMS LAW [Mass Gen Laws ch.12 §5 et seq]; MICHIGAN MEDICAID
FALSE CLAIMS ACT [Mich. Comp. Laws. § 400.601 et seq.] NEVADA FALSE
CLAIMS ACT [Nev. Rev. Stat. Ann. §357.010 et seq.]; NEW HAMPSHIRE
FALSE CLAIMS ACT [N.H. Rev. Stat. Ann. §167:61 et seq.]; NEW
MEXICO MEDICAID FALSE CLAIMS [N.M. Stat. Ann. §27-2F-1 et seq.]; NEW
YORK FALSE CLAIMS ACT [N.Y. State Fin. §§ 187 et. seq.]; OKLAHOMA
MEDICAID FALSE CLAIMS ACT [Okla. Stat. tit. 63 § 5053 et seq.];
TENNESSEE FALSE CLAIMS ACT AND TENNESSEE MEDICAID FALSE
CLAIMS ACT [Tenn. Code Ann. §4-18-101 et seq. and §71-5-181 et seq.] ;
TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code Ann.
§36.001 et seq.]; VIRGINIA FRAUD AGAINST TAXPAYERS ACT [Va. Code
Ann §8.01-216.1 et seq.]; and DISTRICT OF COLUMBIA PROCUREMENT
REFORM AMENDMENT ACT [D.C. Code Ann. §1-1188.13 et seq.]

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

Qui tam plaintiff/relator Bruce Boise, through his attorneys Phillips & Cohen LLP and

Weinstein Kitchenoff & Asher LLC, on behalf of the United States of America, the State of California,

the State of Delaware, the State of Florida, the State of Hawaii, the State of Illinois, the State of

Massachusetts, the State of New Mexico, the State of New York, the State of Nevada, the State of

Tennessee, the State of Texas, the State of Virginia and the District of Columbia (collectively "the

States and the District of Columbia"), for his Complaint against defendant Cephalon, Inc. alleges based

upon personal knowledge, discussions with other former Cephalon employees, and relevant

documents, as follows:

## I.   INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of

America, the States of California, Delaware, Florida. Hawaii, Illinois, Massachusetts, Nevada, New

Mexico, New York, Tennessee, Texas, Virginia ,and the District of Columbia arising from false and/or

fraudulent records, statements and claims made, used and caused to be made, used or presented by

defendant Cephalon, Inc. ("Cephalon") and/or its agents, employees and co-conspirators in violation of

the Federal Civil False Claims Act, 31 U.S.C. §3729 et seq., as amended ("the FCA" or "the Act")

and its state-law counterparts: California False Claims Act, Cal. Govt Code §12650 et seq.; the

Delaware False Claims and False Reporting Act, 6 Del. C. §1201 et seq.; the Florida False Claims

Act, Fla. Stat. Ann. §68.081 et seq.; the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-

168 et seq.; the Hawaii False Claims Act, Haw. Rev. Stat. §661-21 et seq.; the Illinois Whistleblower

Reward and Protection Act, 740 Ill. Comp. Stat. §175/1-8; the Indiana False Claims and

Whistleblower Protection Act, Ind. Code §5-11-5.5 et seq.; the Louisiana Medical Assistance

Program Integrity Law, La. Rev. Stat. §46:437.1 et seq.; the Massachusetts False Claims Law, Mass.

Gen. Laws ch. 12 §5 et seq.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws. §400.601

2

et seq.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §357.010 et seq.; the New Hampshire

False Claims Act, N.H. Rev. Stat. Ann. §167:61 et seq.; the New Mexico Medicaid False Claims Act,

N.M. Stat. Ann. §27-2F-1 et seq.; the New York False Claims Act, N.Y. State Fin. §187 et seq.; the

Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §5053 et seq.;the Tennessee False Claims

Act and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §4-18-101 et seq. and §71-5-181

et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §36.001 et seq.; the

Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216.1 et seq.; and the District of

Columbia Procurement Reform Amendment Act, D.C. Code Ann. §1-1188.13 et seq.

2.   Damages and all other relief sought in this action relate specifically and only to Cephalon's

marketing behavior with respect to Fentora, a drug for which Cephalon obtained FDA approval in

2006 to market for treatment of breakthrough pain in opioid-tolerant patients with cancer.  Such

behavior by Cephalon has been an outgrowth and continuation of similar misconduct that plaintiff/relator

has previously alleged in a related action pending before this Court (also currently under seal) that

Cephalon has engaged in with respect to its other drugs: Gabitril, Provigil and – in particular –  Actiq, to

which Fentora is a successor pharmaceutical.  Allegations regarding those drugs that are repeated in

this Complaint are made here solely for the purpose of providing background information that helps put

Cephalon's behavior as to Fentora in its historic context and that help explain why Cephalon's

improper marketing behavior with respect to Fentora has had such an immediate and wide-ranging

impact.

3.   Since at least 2000,  it has been Cephalon's practice to systematically and illegally promote

its prescription drugs Gabitril, Provigil, Actiq, and – after June, 2006 – Fentora for off-label indications.

In addition to and in support of its off-label marketing efforts, Cephalon's sales force has offered and made unlawful financial inducements to providers to encourage them to prescribe Cephalon drugs, and/or to switch from competitor products. As alleged below, Cephalon has disguised physician inducements as payments for "preceptorships" and speaking fees, among other things.

4. As a direct result of Cephalon's improper practices, federal and state health insurance programs including, but not limited to, Medicaid, MediCal, CHAMPUS/ TRICARE, CHAMPVA and the Federal Employee Health Benefits Program have been caused to pay false or fraudulent claims for reimbursement of off-label uses of the Fentora that would not have been paid but for the defendant's illegal business practices.

5. The False Claims Act was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

6. The Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. Liability attaches when a defendant knowingly seeks payment, or causes others to seek

4

payment, from the Government that is unwarranted.

7.   The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

8.   Based on these provisions, qui tam plaintiff seeks through this action to recover on behalf of the United States and States that authorize similar qui tam actions, damages and civil penalties arising from Cephalon's making or causing to be made false or fraudulent records, statements and/or claims in connection with its knowing off-label marketing of Fentora.  Although Cephalon did not directly submit claims for Fentora to federal and state health insurance programs, it knew that its illegal off-label marketing practices and illegal inducements would cause the submission of thousands of claims to these health programs for prescriptions that were not eligible for program reimbursement.

## II.   **PARTIES**

9.   Plaintiff/relator Bruce Boise is a resident of Melbourne Beach, Florida.  From 1996 to June, 2003, Mr. Boise was employed in Ohio by Cephalon in sales representative and sales manager positions.  Concerned about defendant's misconduct as alleged herein, Boise voluntarily met with FDA officials in January, 2003, and has cooperated thereafter with their efforts to investigate his allegations. He was terminated by the company in 2003 because of his refusal to incorporate improper off-label marketing strategies into his sales approach and for sharing information regarding Cephalon's misconduct with the FDA.

10.   Defendant Cephalon, Inc. ("Cephalon") is an international biopharmaceutical company, incorporated under the laws of the state of Delaware, and headquartered at 145 Brandywine Parkway, West Chester, Pennsylvania, 19380.  Its primary business activity in the United States relates to the manufacture and/or sale of the four drugs discussed in this lawsuit: Provigil, Gabitril, Actiq, and Fentora.

## III.   JURISDICTION AND VENUE

11.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367 and 31 U.S.C. §3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.  Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relator, moreover, would qualify under that section of False Claims Act as an "original source" of the allegations in this Complaint even had such a public disclosure occurred.

12.   This Court has personal jurisdiction and venue over the defendant pursuant to 28 U.S.C. §§1391(b) and 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the defendant has minimum contacts with the United States.  Moreover, the defendant can be found in, resides, and transacts business in the Eastern District of Pennsylvania.

13.   Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because the defendant can be found in and transacts business in the Eastern District of Pennsylvania.  At all times relevant to this Complaint, defendant regularly conducted substantial business within the Eastern District of Pennsylvania, maintained employees and offices in Pennsylvania and made significant sales within Pennsylvania.  In addition, statutory violations, as alleged herein, occurred in this district.

6

## IV.     BACKGROUND

14.   The four main prescription drugs manufactured and/or distributed by defendant  Cephalon

in the United States are Gabitril, Provigil, Actiq, and Fentora (which is the subject of this Complaint).

For ease of reference, Gabitril, Provigil, Actiq, and Fentora will be referred to collectively as "the

Cephalon prescription drugs" for the remainder of this Complaint.

15.   Until 2004, Cephalon pharmaceutical sales and marketing were organized into two

therapeutic areas.   Gabitril and Provigil sales and marketing efforts are undertaken by Cephalon's

Central Nervous System ("CNS") Division.  Actiq was marketed by separate sales staff through

Cephalon's Pain Division. Beginning in early 2004, Cephalon's sales staffs were combined and

expanded to a total marketing staff of approximately 500 sales representatives and managers who now

market all the Cephalon prescription drugs together.

16.   Cephalon sales representatives and managers receive incentive-based compensation that

includes an annual salary, plus a bonus.  An individual sales representative's bonus is determined by

his/her performance in the relevant market and whether s/he satisfies or surpasses targets for product

sales growth.  Accordingly, the more prescription drug sold by a Cephalon sales representative or

prescribed by providers in his or her territory, the higher his or her compensation will be.

## V.     APPLICABLE LAW

### A.     The FDA Regulatory Scheme

17.   Under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new

pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug

demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and

7

effective for each of its intended uses. 21 U.S.C. §355(a) & (d). Approval of the drug by the FDA is the final stage of a multi-year process of study and testing.

18. The FDA does not approve a drug for treatment of sickness in general. Instead, a drug is approved for treatment of a specific condition, for which the drug has been tested in patients. The specific approved use is called the "indication" for which the drug may be prescribed. The FDA will specify particular dosages determined to be safe and effective for each indication.

19. The indication and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also reviewed by the FDA. 21 U.S.C. §§352, 355(d). An example of the drug's labeling is the printed insert in the drug's packaging. The FDA will only approve the new drug application if the labeling conforms to the uses and dosages that the FDA has approved. 21 U.S.C. §355(d).

20. Under the Food and Drug Administration Modernization Act of 1997 ("FDAMA"), if a manufacturer wishes to market or promote an approved drug for alternative uses - i.e., uses not listed on the approved label - the manufacturer must resubmit the drug for another series of clinical trials similar to those for the initial approval. 21 U.S.C. §360aaa(b) & (c). Until subsequent approval of the new use has been granted, the unapproved use is considered to be "off-label." "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified in the label, or treating a different patient population (e.g., treating a child when the drug is approved to treat adults).

21. Although the FDA is responsible for ensuring that a drug is safe and effective for the

8

specific approved indication, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit doctors from prescribing the drug for uses that are different than those approved by the FDA.

22. Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved. Specifically, under the Food and Drug laws, (1) a manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an off-label purpose, and (2) a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§331, 352.

23. An off-label use of a drug can cease to be off label only if the manufacturer submits a supplemental application and demonstrates to the satisfaction of the FDA that the product is safe and effective for the proposed new use. 21 U.S.C. §360aaa(b) & (c).

24. In addition to prohibiting manufacturers from directly marketing and promoting a product's off-label uses, Congress and the FDA have also sought to prevent manufacturers from employing indirect methods to accomplish the same end. For example, Congress and the FDA have attempted to regulate two of the most prevalent indirect promotional strategies: (1) manufacturer dissemination of medical and scientific publications concerning the off-label uses of their products, and (2) manufacturer support for Continuing Medical Education (CME) programs that focus on off-label uses.

25. With regard to the first practice - disseminating written information - the FDAMA only permits a manufacturer to disseminate information regarding off-label usage in response to an

9

"unsolicited request from a health care practitioner." 21 U.S.C. §360aaa-6 (emphasis added). In any

other circumstance, a manufacturer is permitted to disseminate information concerning the off-label uses

of a drug only after the manufacturer has submitted an application to the FDA seeking approval of the

drug for the off-label use; has provided the materials to the FDA prior to dissemination; and the

materials themselves must be in an unabridged form and must not be false or misleading. 21 U.S.C. §§

360aaa(b) & (c); 360aaa-1.

26.   With regard to manufacturer involvement in CME programs, the FDA's examination of

these practices led to publication of an agency enforcement policy in 1997 entitled, "Guidance for

Industry:  Industry-Supported Scientific and Educational Activities," 62 Fed. Reg. 64,074, 64,093,

1997 WL 740420 (F.R.) (1997).  This guidance document states that CME programs must be truly

independent of the drug companies, and sets forth a number of factors that the FDA will consider in

determining whether a program is "free from the supporting company's influence and bias." Id.  These

factors include, among others, an examination of the relationship between the program provider and

supporting company, the company's control of content and selection of presenters, whether there is a

meaningful disclosure of the company's funding and role in the program, whether multiple presentations

of the same program are held, whether the audience is selected by the sales and marketing department

of the company, and whether information about the supporting company's product is disseminated after

the initial program other than in response to an unsolicited request.  Id.  The promotion of off-label drug

uses at a CME program which fails this test of "independence" violates Congress' off-label marketing

restrictions.

27.   In sum, the off-label regulatory scheme protects patients and consumers by insuring that

10

drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body, the FDA.

**B.   Prescription Drug Reimbursement Under Federal Health Care Programs**

28.   Whether a drug is FDA-approved for a particular use will largely determine whether a prescription for that use will be reimbursed under Medicaid and other federal health care programs.

**1.   The Medicaid Program**

29.   Medicaid is a public assistance program providing for payment of medical expenses for low-income patients.  Funding for Medicaid is shared between the federal government and state governments.  The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

30.   Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the drugs and drug uses that the federal government will pay for through its funding of state Medicaid programs.  Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs."  42 U.S.C. §1396b(i)(10), 1396r-8(k)(2), (3).  Covered outpatient drugs are drugs that are used for "a medically accepted indication."  Id.  §1396r-8(k)(3).

31.   A medically accepted indication, in turn, is a use which is listed in the labeling approved by the FDA, or use of which is supported by one of the drug compendia identified in the Medicaid statute. Id. §1396r-8(k)(6).  During the time period relevant to this Complaint, many of the off-label uses of drugs promoted by Cephalon were not eligible for reimbursement from Medicaid because such off-label uses were neither listed in the labeling approved by the FDA nor otherwise supported as safe and

effective by any of the drug compendia specified by the Medicaid statute.  Use of Provigil, for example,

for treating fatigue associated with depression, use of Gabitril for fibromyalgia, post traumatic stress

disorder, and insomnia, and use of Actiq on an outpatient basis for breakthrough pain other than cancer

pain is not supported by the compendia as medically safe and effective, although Cephalon has

promoted the drugs for those and other uses in the ways set forth below.

32.   Additionally, because Cephalon's unlawful off-label marketing efforts were designed to

generate overutilization of their drugs in situations in which the drugs either were not proven safe and

effective or were not medically necessary for treatment of patients' specific medical conditions,

Cephalon caused physicians to submit claims for reimbursement to Medicaid that were unwarranted

and therefor false.

### 2.      Other Federal Health Care Programs

33.   In addition to Medicaid, the federal government reimburses a portion of the cost of

prescription drugs under several other federal health care programs, including but not limited to

CHAMPUS/ TRICARE, CHAMPVA and  the Federal Employees Health Benefit Program.

34.   CHAMPUS/TRICARE, administered by the United States Department of Defense, is a

health care program for individuals and dependents affiliated with the armed forces.  CHAMPVA,

administered by the United States Department of Veterans Affairs, is a health care program for the

families of veterans with 100 percent service-connected disability.  The Federal Employee Health

Benefit Program, administered by the United States Office of personnel Management, provides health

insurance for federal employees, retirees, and survivors.  Coverage of off-label drug use under these

programs is similar to coverage under the Medicaid program.  See, e.g.,TRICARE Policy Manual

6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

35. During the time period relevant to this Complaint, the off-label uses of the Cephalon prescription drugs promoted by Cephalon did not qualify for reimbursement under any of the various federal health care programs because there was inadequate approval or support for such drugs to be eligible for reimbursement and/or because Cephalon's unlawful marketing activity created overutilization of such drugs in situations where they were not medically necessary for treatment of patients' specific medical conditions.

### 3. The Anti-Kickback Statute

36. The federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

37. The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b(b). Under this statute, drug companies may not offer or pay any remuneration, in cash or kind, directly or indirectly, to induce physicians or others to order or recommend drugs that may be

13

paid for by Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, or other federal health care program.

38.   The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a drug company to a physician which has as one of its purposes inducement of the physician to write additional prescriptions for the company's pharmaceutical products.

39.   Concern about improper drug marketing practices like those alleged in this Complaint prompted the Inspector General of the Department of Health and Human Services to issue a Special Fraud Alert in 1994 concerning prescription drug marketing practices that violated the Anti-Kickback law. Special Fraud Alert: Prescription Drug Marketing Schemes, 59 Fed. Reg. 65,376 (Dec. 19, 1994). Among the improper practices cited by the Inspector General are drug companies' payments to physicians where the physician had offered no particular services of benefit to the drug company but the payment appeared to have been based on the volume of business the doctor could generate for the drug company. Id.

40. Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other federal health care programs.  With regard to Medicaid, for example, each physician and pharmacist that participates in the program must sign a provider agreement with his or her state.  Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, which include the anti-kickback provisions of the law.  In Massachusetts and a number of other states, the Medicaid claim form itself contains a certification by the provider that the provider has complied

14

with all aspects of the Medicaid program, including compliance with Federal laws.  In sum, either

pursuant to provider agreements, claims forms, or other appropriate manner, pharmacists and

physicians who participate in a federal health care program generally must certify that they have

complied with the applicable federal rules and regulations, including the Anti-Kickback law.

## VI.   ALLEGATIONS

41.  In the early days of its corporate existence, Cephalon used to take seriously legal restric-

tions on how it could market pharmaceuticals that it manufactured and/or distributed.  Beginning in or

about early 2000, however, as its development of the market for on-label use of its products began to

mature, the company sought to achieve greater rates of growth and thus began focusing efforts on

expanding its sales for off-label uses of its products.  The company continued to pay lip service in its

written materials to FDA's prohibitions against off-label marketing of prescription drugs, so as to give

the false appearance of compliance.  However,  through oral directives and by altering its marketing

program design Cephalon increasingly pressured its sales force to target inappropriate medical

specialists and to meet ever-increasing sales quotas that it knew would require its sales force market

off-label uses of its products and to engage in kickbacks and other illegal remunerations in order to

reach demanded levels of sales of each of the Cephalon prescription drugs.

### A.  Cephalon Has Illegally Promoted Provigil for Off-Label Treatments.

42.   Until January  2004, Provigil's only on-label indication was for treatment of excessive

daytime sleepiness associated with narcolepsy.  In January 2004, FDA approved on-label use to

include improving daytime wakefulness of patients suffering from obstructive sleep apnea/ hypopnea

syndrome and shift work sleep disorder.  Since at least January 2000,  however, Cephalon was already

15

aggressively marketing Provigil for those conditions, as well as for continued off-label uses such as fatigue associated with depression, fatigue associated with multiple sclerosis, fatigue associated with schizophrenia, chronic fatigue, and for attention deficit hyperactivity disorder in children.

43. To encourage off-label marketing by its sales force, Cephalon de-emphasized sales calls to sleep specialists likely to be treating patients with on-label indications for use of Provigil and directed its sales representatives instead to concentrate their sales calls increasingly to psychiatrists whom Cephalon's research indicated were treating patients likely to suffer the kinds of disorders for which off-label prescriptions could be solicited. Such targeting was done, for example, with psychiatrists who prescribed substantial amounts of anti-depressant drugs, as a means of attempting to develop off-label sales of Provigil for fatigue associated with depression. Cephlan told its sales representatives that they should plan on visiting target physicians 8-10 times per year in order to achieve increased productivity of those physicians in writing new prescriptions for Cephalon drugs. Sales representatives who did not make a priority of calling on psychiatrists identified by Cephalon as likely candidates for off-label sales, were verbally rebuked and/or financially punished for not pursuing those leads.

44. Cephalon also directly manipulated its bonus incentive program to encourage promotion of off-label sales. Prior to 2000, Cephalon had built into its bonus incentive program terms designed to limit incentives for sales personnel unlawfully to market the Cephalon prescription drugs off label. Substantial off-label sales did not count toward fulfillment of sales representatives' sales quotas, and off-label sales were not a basis upon which quarterly bonuses would be earned. In or about 2000, however, when Roy Craig was hired by Cephalon as Vice President of Sales Operations, those constraints were removed. At Craig's direction, required sales quotas were substantially increased,

16

and potential bonuses to be made from increased sales beyond quota levels were uncapped, all in an effort to encourage greater off-label marketing by Cephalon's sales representatives.  In fact, required sales quotas came to be raised so high that the only realistic way for sales representatives to reach required (pre-bonus) levels of performance was to find ways to increase off-label sales.

45.   During this same period, oral presentations from upper management to sales representatives and managers at Cephalon's national and regional sales meetings became more openly disdainful of FDA's stricture against off-label marketing.  Ever-greater attention was directed during conferences to discussing techniques that could be applied by sales representatives when meeting with physicians to turn discussion to potential off-label uses of Cephalon's drugs without being too obvious about what was being done.

46.   One technique used to achieve this goal was for sales representatives  to bring up the putative mechanism of action (the actual mechanism of action for Provigil is not known, but sales representatives would discuss the suspected mechanism of action as if it were established) of their drugs to physicians orally and with visual aids, shepherd discussion to off-label medical conditions that might be addressed through the same mechanism of action, and ask the physicians if they had patients that might benefit from application of such a therapeutic approach to their conditions.

47.   Cephalon-sponsored case studies were touted and made available to physicians by sales representatives in support the claimed off-label benefits.  But such studies typically were retrospective analyses solicited by Cephalon from physicians who prescribed Provigil off-label and whose patients the doctors believed the product showed promising effects. Such anecdotal, individual case observations were in lieu of control-group studies designed and executed to measure the efficacy of

17

Cephalon's product compared to placebo treatment or no treatment at all.

48. Strategies also were developed to lure potentially-large off-label prescribers to promotional activities dressed up as continuing medical education ("CME") opportunities. Among these was the recruitment by Cephalon sales representatives in 2001 and 2002 of potentially high-prescribing physicians to attend national training sessions to become speakers for Cephalon's drugs at "Medical Education Programs" that were sponsored locally by the sales representatives). These three-or-four-day speaker training events were done on an all-expense-paid basis at luxury resort locations in Florida, California and Bermuda. Although pitched as presentations by independent experts, in violation of the FDAMA, Cephalon in fact exercises substantial control over the programs. It has hired a psychiatrist, Steven Stahl, to make a presentation which it largely prepared and finally reviewed and approved and which emphasized potential off-label applications of Cephalon's products. In addition, Cephalon sales representatives sometimes attend the presentations and make themselves available to answer questions about off-label use of Cephalon products that might arise. Indeed, such off-label questions were often "planted" by Cephalon representatives to appear to be unsolicited.

49. Potential "speakers" are chosen to attend speaker training events based on their potential market share as off-label prescribers of Cephalon products. Because they are "trained" as an inducement to write off-label prescriptions, rather than because of any skill as public speakers, many are ill-suited actually to serve as speakers at local events and were never intended to be asked. Those that have been asked to lead local Cephalon "Medical Education Programs" ("MEPs") have been paid speaking fees from the budget of their local Cephalon sales representative to make dinner or lunch presentations to other physicians that Cephalon's sales representatives had identified as potentially

18

significant off-label prescribers of Cephalon drugs. Such payments were made even if no other invited physicians actually attended the planned presentation. However, even good public speakers have been dropped by Cephalon from those that would be hired to lead future Medical Education Programs if experience later showed that they did not themselves write substantial off-label prescriptions for Cephalon's products. In 2003, for example, relators manager Joe Haygood instructed relator not to hire Dr. Weiss as a speaker at any future MEPs unless and until Dr. Weiss's personal prescription performance substantially improved.

50. Cephalon's local Medical Education Programs are offered as CME opportunities for the local physicians that the sales representatives identified to Cephalon's medical liaisons as promising sales leads to invite. Slide presentations presented at those meetings closely track the presentations made at the Steven Stahl training sessions, including the high level of attention paid to potential off-label use doctors can make of Cephalon's drugs. As is true with Dr. Stahl's presentation, the local speakers' presentations are also largely prepared (and finally reviewed and approved) by Cephalon's sales representatives, who attend the sessions as well and answer questions regarding off-label use. (Indeed, at one such event in 2003, Phil Tocco, the sales manager for Cephalon's Pittsburgh office, completely supplanted the physician speaker in responding to questions about off-label uses of Cephalon's products. Mark Macrides, another Cephalon sales representative who attended the event, confided to another Cephalon sales manager, Mike Weatherholt, his concern that Tocco's behavior was obviously and completely out of bounds. Weatherholt agreed and raised the concern up the chain of command. In response, Roy Craig called Weatherholt and berated him for being the kind of manager that a sales representative felt comfortable calling to complain about off-labeling marketing

19

practices of other employees.)

51.  In 2004 alone, Cephalon planned 430 such medical education dinners for psychiatrists, with an expected attendance of 10-12 doctors per session.  In prior years, sales representatives' annual budget for these and other off-label promotional activities has been $20,000-$25,000 each.

52.  As physicians have become more reluctant to devote time to such presentations -- because of their growing sense that they are mere marketing ploys -- with the knowledge and implied or explicit consent of their managers, Cephalon's sales representatives have used financial inducements to convince physicians to attend the presentations.  Such inducements have included such things as $500 "preceptorship" payments made by the sales representatives to physicians for the putative "educational" purpose of permitting the sales representatives to observe the physician's practice for a 2-4 hour period, so that the sales representative could better understand how the physician evaluates, diagnoses, and treats patients.  Such "shadowing," however, in reality has been intended to buy access to physicians, and to reward high-prescribers with financial inducements.  Indeed, if physicians were reluctant to have a sales representative present when they are treating patients, sales representatives paid the $500 inducement nonetheless and simply spent the time allotted to the preceptorship in the physician's waiting room or coffee room. (This was an idea proposed by sales representative Rob Rondeau at a Great Lakes Region sales meeting in 2002 or 2003 and approved by Joe Haygood, relator's former manager.)  The real purpose of such preceptorship payments has not been educational at all, but to induce physicians to attend a marketing presentation in which one physician hired by Cephalon will discuss off-label use of Cephalon drugs with other physicians Cephalon paid or otherwise convinced to attend.

20

53. Sales representatives who balked at participating in the off-label marketing of Provigil and other Cephalon drugs through such bogus "Medical Education Programs" were rebuked and financially punished by the company. For instance, Joe Haygood denied relator the bonus he had otherwise earned through his direct sales efforts in 2002 because relator recognized such Medical Education Programs as improper off-label marketing and thus refused to utilize that marketing device as a means of keeping pace with other sales representatives who were willing to do as the company expected.

54. Cephalon further used the off-label marketing information it included in Steven Stahl's presentation to educate its own sales representatives about off-label uses of its products, so that they could effectively promote the drugs off-label to physicians they detailed. After Steven Stahl presented off-label material at Cephalon's national sales meeting in February, 2003, he noted to Mike Thiem, Cephalon's Director of Medical Liaisons, the almost exclusive focus on sales representatives in questions that followed the presentation on the off-label aspects of the presentation. When Thiem thereafter related Stahl's expressed concern about that focus to Roy Craig in relator's presence, Craig's response was that Cephalon hired Stahl and that Cephalon tells Stahl where to draw lines regarding off-label marketing, not the other way around.

55. Cephalon's efforts to transform "educational" and "research" resources into off-label marketing tools extends generally to its use of medical liaisons. Done properly, medical liaisons between a company and the medical community are typically Ph.D.'s who are qualified to coordinate genuine research efforts among academic doctors. Roy Craig has staffed Cephalon's medical liaison instead with former sales representatives, and has used the position primarily as an extension of

21

Cephalon's regional marketing efforts.

56.   Consistent with their marketing orientation, Cephalon's medical liaisons frequently sponsor reports on the efficacy of Cephalon products based not double-blind control studies but on retrospective case reviews by physicians who had tried Cephalon's products off-label on their own patients and believed them to have some therapeutic effect. These case review "studies," were then provided to Cephalon's sales representatives so that they could invite other physicians to request the data from Cephalon's "medical liaisons" to support the sales representative's suggested off-label uses of the drugs.

57.   In further violation of the FDAMA, Cephalon also encourages and directs its sales representatives to invite and encourage physicians upon whom they call to request information about off-label usage of Provigil and the other Cephalon prescription drugs from Cephalon as a means of marketing such off-label uses. Sales representatives are provided Medical Information Request Forms ("MIRFs") by Cephalon to offer physicians in order to make such requests easier for physicians to submit. For a time, Cephalon imposed a quota on its sales representatives that required them to obtain completed MIRFs from physicians upon whom they called at a rate that exceeded one such request per day. Although that quota was discontinued, sales representatives continue to encourage doctors to make such requests and lead discussion about the availability of such information from Cephalon so that requests when made almost always are directed to available information that Cephalon believes will make off-label use of its products appear more attractive. Physicians are never told about the existence of information that would make off-label use of a Cephalon product less attractive. Requests to Cephalon's home office for such information from physicians are thus much more rare than requests for

22

favorable information.

58. For example, because available literature regarding Actiq is laden with disclaimers regarding off-label use, Cephalon's management considers it more likely to discourage than to encourage off-label use. Cephalon sales representatives thus are advised not to initiate discussions with physicians about the existence or availability of such materials and certainly never invite them to request such information. As a result, such information is rarely requested from Cephalon by physicians, whereas information that Cephalon regards as favorable for off-label usage frequently is requested by physicians upon whom Cephalon sales representatives have recently visited.

59. Another tool that Cephalon has provided its sales representatives to advance off-label sales is printouts of ICD-9-CM Diagnostic Codes related to potential off-label uses of its products. Such tools do not provide any material value to legitimate marketing efforts. Rather, they are distributed by Cephalon to sales representatives primarily so that sales representatives will coach physicians on which diagnosis codes may be used to circumvent reimbursement edits of public and private insurers that are designed to limit payment for off-label use of drugs like Cephalon's to a limited set of disease states.

60. Relator heard this coaching practiced described at district sales meetings in Cancun in February 2002, in Detroit in the fall of 2002, and in Cleveland in the fall of 2003. For example, with respect to the off-label use of Provigil, sales representatives were informed at those sales meetings that physicians could be coached to use ICD-9-CM diagnostic code for Idiopathic Hypersomnia (code 780.54, which relates to an disorder of actual sleep) to gain reimbursement for treatment of mere malaise or fatigue, which is properly identified by ICD-9-CM diagnostic code 780.7.

23

61.  At the same time Cephalon was pressuring its existing sales force to market off-label so that the company could make its sales growth goals, it also developed hiring criteria for potential new sales representatives that inquired whether the candidate would be able to "work within the gray area" of off-label marketing.  Cephalon has looked to hire only sales representatives that demonstrated understanding that off-label marketing, while explicitly disavowed in official statements of company policy and practice, was encouraged, expected, and necessary in the field in order for the company and the sales representative, individually, to reach the growth goals upon which Cephalon measured "success."  It has also looked to hire sales representatives who it believed could engage in extensive off-label marketing effectively -- but not too obviously.

62.  Cephalon's message to its sales representatives to engage in subtle but extensive off-label marketing has been broadly understood and implemented.  Predominantly because of off-label marketing efforts (including the conduct set forth above), sales of Provigil have risen from $25.3 million in 1999 to projected sales of $375 - $425 million for 2004.  During the same period, off-label uses of Provigil have grown to account for at least 80-90% of all such sales.

63.  Top bonuses earned by sales representatives most willing to market off-label similarly increased by approximately 100% over the top bonuses paid before expanding off-label sales became the subject of substantial financial incentives.

64.  Approximately 8.5% of all Provigil sales are paid for by Medicaid.

**B.  Cephalon Has Illegally Promoted Gabitril in the Same Manner as Provigil.**

65.  Since Cephalon purchased the rights to Gabitril from Abbott Laboratories in late 2000, Chephalon has illegally promoted that drug predominantly for off-label indications in an essentially

24

identical manner to that it uses for Provigil.

66.   Gabitril is a selective gamma-aminobutyric acid ("GABA") reuptake inhibitor that has been approved by the FDA only for use as adjunctive therapy in the treatment of partial seizures in epileptic patients.  Cephalon however makes virtually no direct marketing effort to sell Gabitril for its FDA-approved use.  Rather, Cephalon has mounted a national marketing campaign to promote Gabitril almost exclusively for unapproved uses ranging from treatment for anxiety to insomnia to neuropathic pain relief.  Indeed, because Gabitril marketability for its on-label use is so limited, Cephalon sales representatives are actually <u>discouraged</u> by their management from devoting marketing time to neurologist and other physicians with specialties relating to epilepsy.  They are encouraged, instead, to concentrate their sales calls on psychiatrists who are known by Cephalon to prescribe subscribe substantial amounts of anti-anxiety medications and as a cheaper alternative for some of the same off-label uses for which Pfizer's Warner-Lambert division was recently fined for improperly marketing Neurontin.

67.   All the violations of the law described in paragraphs 41-64, above, with respect to Provigil have occurred as well with respect to Gabitril, which is generally marketed to the same physicians at the same time as Provigil.

68.   Cephalon's improper marketing of Gabitril has been very profitable.  In just four years, Gabitril's annual sales revenues exploded from $4.4 million in the year Cephalon acquired rights to the drug (2000) to anticipated sales of $80 - $90 million for 2004.  Approximately 90% of sales for Gabitril are for off-label uses.  More than 23% of all Gabitril sales are paid for by Medicaid.

C.   <u>Cephalon Has Illegally Promoted Actiq.</u>

25

69. Cephalon has aggressively promoted Actiq for off-label use in much the same manner as Provigil and Gabitril, since it purchased Anesta Corporation, the former owner of rights in that drug, in October, 2000.

70. Actiq uses Cephalon's proprietary oral transmucosal delivery system (a lollipop) to deliver fentanyl citrate, a powerful, Schedule II opioid analgesic (painkiller) to treat pain. Its sole FDA-approved use is for treating breakthrough cancer pain in opioid tolerant patients. "Breakthrough" cancer pain is a flare of moderate to severe pain that "breaks through" medication cancer patients use to control their persistent pain. Actiq's side effects are typical of opioids, and can range from somnolence, nausea, vomiting and dizziness to respiratory depression, which can be life threatening.

71. From October, 2000 until the beginning of 2004, Cephalon marketed Actiq through a group of 60 to 90 Cephalon field sales representatives and managers who specialized in that product and who made sales calls primarily to pain specialists and oncologists. As a result of efforts by those sales representatives to expand the market to off-label pain applications in pain management, sales of Actiq increased from $15.2 million in 2000 to $237.5 million in 2003.

72. Specifically with a view toward expanding the market to off-label pain applications even further, in the beginning of 2004, Cephalon combined and expanded its sales forces so that now all of its sales representatives and managers market Actiq to a broader group of physicians that now includes internists, general practitioners, and family practitioners who might prescribe the mediation for outpatient uses. Cephalon sales representatives market off-label uses of Actiq to such physicians and coaches them with respect to ICD-9-CM diagnostic codes that can be used in support of reimbursement claims.

26

73.  Although the general effectiveness of opioids like Actiq in treating various forms of pain is well known, the self-dosing nature of Actiq's delivery system together with the high risks associated with overdosing on opioids raise safety concerns as the primary danger raised by off-label – and/or inadequately supervised – use of this drug.  For that reason serious concern has been expressed even within Cephalon about the risks inherent with its marketing decision to promote off-label use of Actiq to internists, general practitioners, and family practitioners who may not have the experience with opioids necessary to fully appreciate the dangers of the drug and the need to ensure that it is not over-prescribed or prescribed without sufficient patient education.

74.  Despite these concerns, and despite the lack of scientific studies or compendia discussion that support the safety and efficacy of Actiq for any of the wide variety of outpatient off-label pain treatments it promotes, Cephalon has elected to change its marketing model as of 2004 so that more sales representatives with less expertise about the drug are now marketing the product to a larger pool of physicians (also with less expertise in pain management and opioids) in an effort to further accelerate the growth of off-label use of the product.

75.  Primarily as a result of its off-label marketing efforts, Cephalon's projects total sales of Actiq in 2004 will total $325 - $375 million.  As of 2004, over 90% of Actiq sales are for off-label uses.  Approximately 8.3% of all Actiq sales are paid for by Medicaid.

**D.  Cephalon Has Illegally Promoted Fentora.**

76.  Since it obtained FDA approval in the second half of 2006, to market that drug for treatment of breakthrough pain in opioid-tolerant patients with cancer, Boise has been informed by a reliable source with high-place connections within Cephalon and therefore believes that Cephalon has

27

aggressively promoted Fentora, a fentanyl buccal tablet similar to Actiq, for off-label use in much the same manner as it has marketed Provigil, Gabitril, and Actiq.

77.  Because Actiq is going off patent, Cephalon as made arrangements to permit introduction of a generic version of that drug, and has indeed begun to sell its own generic version of the drug in bulk to Barr Laboratories, Inc. for packaging and labeling by that company.

78.  Fentora (fentanyl buccal effervescent tablet, delivered with Cephalon's new "Ora-Vescent® technology) is not a precise chemical or delivery-form equivalent of Actiq (transmucosal fentanyl citrate lollipop) and thus has its own, new patent protection.  Consequently, it does not face competition from true generic equivalents and can be sold at higher prices demanded for new drugs.

79.  Cephalon's sales force for pain medications has thus shifted its marketing emphasis for break-through opioid painkillers from Actiq to Fentora , which it now markets off label through to the same kinds of  internists, general practitioners, and family practitioners, with the same kinds of risks to patients as exist with respect to off-label marketing of Actiq.  In addition to the risks inherent to all opioids that it shares with Actiq, Fentora introduces additional risks associated with the possibility that patients might accidently swallow the tablets whole.  Especially for children, that risk increases concerns about potential overdosing.

80. As with the other drugs identified in this complaint, Cephalon's marketing efforts for Fentora are focused primarily on off-label users, in light of the narrow scope of its FDA marketing approval (breakthrough cancer pain) and the much more lucrative profits promised by unencumbered marketing of its products.  Through a strong push by Cephalon and its sales force to convert former Actiq prescribers to prescribing Fentora instead, Cephalon seeks to reap continued economic benefits

from its prior improper sales conduct used to capture a huge off-label market for sales of Actiq.

### Count I
### Federal False Claims Act
### 31 U.S.C. §§3729(a)(1) and (a)(2)

81.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

82.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended, relating to defendant's marketing of Fentora.

83.  By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

84.  By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to approve and pay such false and fraudulent claims.

85.  Each prescription that was written as a result of defendant's illegal off-label marketing practices represents a false or fraudulent record or statement. And, each claim for reimbursement for such off-label and illegally induced prescriptions submitted to a federal health insurance program represents a false or fraudulent claim for payment.

86.  Relator cannot at this time identify all of the false claims for payment that were caused by Cephalon's conduct. The false claims were presented by thousands of separate entities, across the United States, since 2006. Relator has no control over or dealings with such entities and has no access to the records in their possession.

87.  The Government, unaware of the falsity of the records, statements and claims made or

29

caused to be made by the defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and illegal inducements.

88. By reason of the defendant's acts, the United States has been damaged, and continues to be damaged, in an amount to be determined at trial. Federal health insurance programs likely also have paid claims for off-label prescriptions for indications that were not approved by the FDA and/or for prescriptions that were illegally induced by Cephalon through its off-labeling marketing efforts.

Count II
California False Claims Act
Cal Govt Code §12651(a)(1) and (2)

89. Relator  realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

90. This is a claim for treble damages and penalties under the California False Claims Act.

91. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

92. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

93. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

94. By reason of the defendant's acts, the State of California has been damaged, and continues

30

to be damaged, in an amount to be determined at trial.

## Count III
### Delaware False Claims And Reporting Act
### 6 Del C. §1201(a)(1) and (2)

95. Relator  realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

96. This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

97. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

98. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

99. The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

100. By reason of the defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in an amount to be determined at trial.

## Count IV
### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)

101. Relator realleges and incorporates by reference the allegations contained in paragraphs 1

31

through 80 of this Complaint.

102.  This is a claim for treble damages and penalties under the Florida False Claims Act.

103.  By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

104.  By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

105.  The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

106.  By reason of the defendant's acts, the State of Florida has been damaged, and continues to be damaged, in an amount to be determined at trial.

32

Count V
Georgia False Medicaid Claims Act
Ga. Code Ann. §49-4-168.1(1), (2) and (7)

107.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

108. This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

109.  By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

110.  By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

111.  The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

112.  By reason of the defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in an amount to be determined at trial.

Count VI
Hawaii False Claims Act
Haw. Rev. Stat. §661-21(a)

113.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

33

114. This is a claim for treble damages and penalties under the Hawaii False Claims Act.

115. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

116. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

117. The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

118. By reason of the defendant's acts, the State of Hawaii has been damaged, and continues to be damaged, in an amount to be determined at trial.

Count VII
Illinois Whistleblower Reward And Protection Act
740 Ill. Comp. Stat. §175/3(a)(1), (2)

119. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

120. This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

121. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

122. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be

34

made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

123. The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

124. By reason of the defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in an amount to be determined at trial.

## Count VIII
### Indiana False Claims and Whistleblower Protection Act
Ind. Code Ann. § 5-11-5.5-2(b)(1)-(2), (6)

125. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

126. This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

127. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

128. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

129. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and

35

continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

130. By reason of the defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in an amount to be determined at trial.

## Count IX
### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1), (2)

131. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

132. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

133. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

134. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

135. The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

136. By reason of the defendant's acts, the State of Massachusetts has been damaged, and continues to be damaged, in an amount to be determined at trial.

36

Count X
Michigan Medicaid False Claims Act
Mich. Comp. Laws. § 400.601 et seq.

137.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint..

138. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

139.  By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

140.  By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

141.  The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

142.  By reason of the defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in an amount to be determined at trial.

Count XI
Nevada False Claims Act
Nev. Rev. Stat. Ann. §357.040(1)(a), (b)

143. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

144. This is a claim for treble damages and penalties under the Nevada False Claims Act.

145. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

146. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

147. The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

148. By reason of the defendant's acts, the State of Nevada has been damaged, and continues to be damaged, in an amount to be determined at trial.

Count XII
New Hampshire False Claims Act
N.H. Rev. Stat. Ann. §167:61-b(I)(a), (b), and (e)

149. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

150. This is a claim for treble damages and penalties under the New Hampshire False Claims

38

Act.

151. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

152. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

153. The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

154. By reason of the defendant's acts, the State of New Hampshire has been damaged, and continues to be damaged, in an amount to be determined at trial.

### Count XIII
New Mexico Medicaid False Claims Act
N.M. Stat. Ann. § 27-2F-1 et seq.

155. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

156. This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

157. By virtue of the acts described above, defendant knowingly presented or caused to

39

be presented, false or fraudulent claims to the New Mexico State Government for payment or

approval.

158. By virtue of the acts described above, defendant knowingly made, used, or caused to be

made or used false records and statements, and omitted material facts, to induce the New Mexico State

Government to approve and pay such false and fraudulent claims.

159. The New Mexico Government, unaware of the falsity of the records, statements and

claims made, used, presented or caused to be made, used or presented by defendant, paid and

continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing

practices and inducements.

160. By reason of the defendant's acts, the State of New Mexico has been damaged, and

continues to be damaged, in an amount to be determined at trial.

Count XIV
New York False Claims Act
N.Y. State Fin. §§ 187 et. seq.

161. Relator realleges and incorporates by reference the allegations contained in paragraphs 1

through 80 of this Complaint.

162. This is a claim for treble damages and penalties under the New York False Claims Act.

163. By virtue of the acts described above, defendant knowingly presented or caused to be

presented, false or fraudulent claims to the New York State Governments for payment or approval.

164. By virtue of the acts described above, defendant knowingly made, used, or caused to be

made or used false records and statements, and omitted material facts, to induce the New York State

Government to approve and pay such false and fraudulent claims.

40

165.  The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

166.  By reason of the defendant's acts, the State of New York has been damaged, and continues to be damaged, in an amount to be determined at trial.

Count XV
Oklahoma Medicaid False Claims Act
Okla. Stat. tit. 63 §5053.1(B)(1), (2) and (7)

167.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

168. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

169.  By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

170.  By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

171.  The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and

41

continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

172. By reason of the defendant's acts, the State of Oklahoma has been damaged, and continues to be damaged, in an amount to be determined at trial.

Count XVI
Tennessee False Claims Act and Tennessee Medicaid False Claims Act
Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1)

173. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

174. This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

175. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

176. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

177. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

178. By reason of the defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in an amount to be determined at trial.

42

Count XVII
Texas Medicaid Fraud Prevention Law
Tex. Hum. Res. Code Ann. §36.002

179.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

180.  This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

181.  By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

182.  By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

183.  The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

184.  By reason of the defendant's acts, the State of Texas has been damaged, and continues to be damaged, in an amount to be determined at trial.

Count XVIII
Virginia Fraud Against Taxpayers Act
Va. Code Ann. §8.01-216.3(a)(1), (2)

185.  Relator realleges and incorporate by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

43

186. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

187. At this time, it is reported that data available to Virginia does not yet show any claims made to its Medicaid program for reimbursement relating to Fentora prescriptions. However, because Fentora is a new drug that Cephalon is marketing off-label nationwide and because Virginia has purchased substantial quantities of its successor drug Actiq in the past, it is likely that such claims will be processed in the future and that a substantial portion of such claims will result from improper off-label marketing currently being conducted by Cephalon.

Count XIX
District of Columbia Procurement Reform Amendment Act
D.C. Code Ann. §1-1188.14(a)(1), (2)

188. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint.

189. This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

190. By virtue of the acts described above, defendant knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

191. By virtue of the acts described above, Cephalon knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

192. The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendant, paid and

44

continues to pay the claims that would not be paid but for Cephalon's illegal off-label marketing practices and inducements.

193.  By reason of the defendant's acts, the District of Columbia has been damaged, and continues to be damaged, in an amount to be determined at trial.

Prayer

WHEREFORE, qui tam plaintiff prays for judgment against the defendant as follows:

1.   that defendant cease and desist from violating 31 U.S.C. §3729 et seq., and the equivalent provisions of the States and the District of Columbia's statutes set forth above;

2.   that this Court enter judgment against defendant in an amount equal to three times the amount of damages the United States has sustained because of defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3.   that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of California has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Cal. Govt Code §12651(a);

4.   that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Delaware has sustained because of defendant's actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. §1201(a);

5.   that this Court enter judgment against defendant in an amount equal to three times the

amount of damages the State of Florida has sustained because of defendant's actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2);

6.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Georgia has sustained because of defendant's actions, plus a civil penalty of $11,000 for each violation of  Ga. Code Ann. §49-4-168.1;

7.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Hawaii has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. §661-21(a);

8.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

9.      that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Indiana has sustained because of defendant's actions, plus a civil penalty of $5,000 for each violation of  Ind. Code Ann. §5-11-5.5-2(b);

10.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B;

11.     that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Michigan has sustained because of defendant's actions, plus civil penalties for each violation of Mich. Comp. Laws. § 400.601 et seq.;

12.     that this Court enter judgment against defendant in an amount equal to three times the

46

amount of damages the State of Nevada has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1)(a), (b);

13.  that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Mexico has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of N.M. Stat. Ann. §27-2F-4;

14.  that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of N.H. Rev. Stat. Ann. §167.61-b(I);

15.  that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of New York has sustained because of defendant's actions, plus civil penalties of $12,000 for each violation of N.Y. State Fin. § 189;

16.  that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Okla. Stat. Tit. 63 §5053.1(B);

17.  that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §71-5-182(a)(1);

47

18.    that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Texas has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

19.    that this Court enter judgment against defendant in an amount equal to three times the amount of damages the State of Virginia sustains because of defendant's actions, plus a civil penalty of $10,000 for each violation of Va. Code Ann. §8.01-216.3(a)(1), (2);

20.    that this Court enter judgment against defendant in an amount equal to three times the amount of damages the District of Columbia has sustained because of defendant's actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. §1-1188.14(a)(1), (2);

21.    that qui tam plaintiff be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the States and the District of Columbia statutes set forth above;

22.    that qui tam plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and

23.    that all plaintiffs recover such other relief as the Court deems just and proper.

48

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, qui tam plaintiff hereby demands a

trial by jury.

Dated: December 18, 2007

WEINSTEIN KITCHENOFF
& ASHER LLC

By: _____

Robert S. Kitchenoff (PA Bar No. 45993 )
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Tel: (215) 545-7200
Fax: (215) 545-6535

and

Peter W. Chatfield
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, D.C. 20036
Tel: (202) 833-4567
Fax: (202) 833-1815
Attorneys for Qui Tam Plaintiff

**FILED**

JAN 03 2008

MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

49

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

08-0287

Under Seal

## I. (a) PLAINTIFFS

United States of America, et al., Ex Rel. Bruce Boise
Melbourne Beach, Florida

## DEFENDANTS

Cephalon, Inc.
145 Brandywine Parkway
West Chester, PA 19380

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Chester
(IN U.S. PLAINTIFF CASES ONLY)
NOTE    IN LAND CONDEMNATION CASES USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)

Weinstein Kitchenoff & Asher LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 545-7200

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION    (PLACE AN "X" IN ONE BOX ONLY)

X 1. U.S. Government
   Plaintiff

☐ 3. Federal Question
   (U.S. Government not a party)

☐ 2. U.S. Government
   Defendant

☐ 4. Diversity
   Indicate Citizenship of Parties
   in item III)

## III. CITIZENSHIP OF PRINCIPLE PARTIES    (PLACE AN "X" IN ONE BOX FOR PLAIN.
(For Diversity Cases Only)                        AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principle Place of business in this state | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principle Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)
☐ 153 Recovery of Overpayment of Veterans Benefits
☐ 160 Stockholders Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury– Med Malpractice
☐ 365 Personal Injury– Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R R & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt Relations
☐ 730 Labor/Mgmt Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl Ret Inc Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (US Plaintiff or Defendant
☐ 871 IRS-Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Acts
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of States Statutes
X 890 Other Statutory Actions

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
Transferred from
☐ 5 another district (specify)
☐ 6 Multidistrict Litigation
Appeal to District Judge from
☐ 7 Magistrate Judgment

## VI. CAUSE OF ACTION    (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

False Claims Act, 31 U.S.C. § 3730 (b)(2) et seq.

## VII. REQUESTED IN COMPLAINT:

DEMAND

CHECK YES only if demanded in complaint

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**JURY DEMAND:** X YES ☐ NO

## VII. RELATED CASE (S) IF ANY    (See instructions): US Ex Rel Boise v. Cephalon, Inc.

JUDGE    Thomas J.O'Neill, Jr.

DOCKET NUMBER    04-4401

DATE
12-17-07

SIGNATURE OF ATTORNEY OF RECORD
Robert P. Kitchenoff

JAN 3 2008

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | |
|---|---|
| UNITED STATES OF AMERICA; THE STATES )<br>OF CALIFORNIA, DELAWARE, FLORIDA, )<br>GEORGIA, HAWAII, ILLINOIS, INDIANA, )<br>MICHIGAN, MASSACHUSETTS, NEVADA, )<br>NEW HAMPSHIRE, NEW MEXICO, NEW YORK,)<br>OKLAHOMA, TENNESEE, VIRGINIA, AND )<br>THE DISTRICT OF COLUMBIA )<br>EX REL. BRUCE BOISE, )<br>           Plaintiffs, )<br>   v. )<br> )<br>CEPHALON, INC., )<br>           Defendant. )<br>_____) | CIVIL ACTION<br><br>No. 07-cv-__ 08 0287<br><br>Under Seal |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus -- Cases brought under 28 U.S.C. §2241 through §2255.  ( )

(b) Social Security -- Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.  ( )

(c) Arbitration -- Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos -- Cases involving claims for personal injury or property damage from exposure to asbestos.  ( )

(e) Special Management -- Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)  (X)

(f) Standard Management -- Cases that do not fall into any one of the other tracks.  ( )

December 17, 2007

_Robert S. Kitchenoff_
Robert S. Kitchenoff, Attorney for Plaintiffs

JAN 3 2008

Telephone: (215) 545- 7200        Fax: (215) 545-6535        E-mail: kitchenoff@wka-law.com
(Civ. 660) 7/95

**DESIGNATION FORM**

*Under Seal*

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff:  Melbourne Beach, Florida

08 0287

Address of Defendant:  145 Brandywine Parkway, West Chester, Pennsylvania, 19380

Place of Accident, Incident or Transaction:  Nationwide

Does this case involve multidistrict litigation possibilities?          Yes ☐  No **X**
*RELATED CASE, IF ANY:*
Case Number:  04-4401          Judge  Thomas J. O'Neill, Jr.          Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?          Yes ☐  No **X**

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?          Yes **X**  No

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?          Yes ☐  No **X**

**CIVIL: (Place X in ONE CATEGORY ONLY)**

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, an
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. **X** All other Federal Question Cases
   (Please specify)  **False Claims Act, 31 U.S.C.**

FILE NO. 08 0287  DATE:  JAN 3 2008

ASSIGNED TO:  *Judge Thomas O'Neill*

RELATED CASE NO:  *04CV4401*

CATEGORY:  *All Other Federal Questions*

**ARBITRATION CERTIFICATION**

I,   Robert S. Kitchenoff  , counsel of record do hereby certify:

☒  Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐  Relief other than monetary damages is sought.

DATE: **December 18, 2007**          *Robert S. Kitchenoff*          45993
                                   Attorney-at-Law                    Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38

JAN 3 2008

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.
DATE: _____

_____          _____
Attorney-at-Law          Attorney I.D.#