IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | : | CIVIL ACTION |
| BRUCE BOISE, et al. | : | NO. 08-287 |
| | : | |
| v. | : | |
| | : | |
| CEPHALON, INC., et al. | : | |
| | : | |
| O'NEILL, J. | : | July 21, 2015 |

## MEMORANDUM

Plaintiffs Bruce Boise, Keith Dufour and Andrew Augustine bring this action against defendants Cephalon, Inc. and John Does #1-100 to recover damages and civil penalties on behalf of the United States as qui tam relators pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et seq. (FCA) and analogous state laws. This matter comes before me on Cephalon's motion to dismiss relators' 31 U.S.C. § 3729(a)(1)(G) claims[1]

---

[1] Relators also allege in their third amended complaint that "to the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, e.g., 31 U.S.C. § 3729(a)(7)." Dkt No. 121 at ECF 148 n.4. Whether relators' claims are analyzed under § 3729(a)(7) or § 3729(a)(1)(G) does not change the outcome here, though both parties argue that the 2009 Fraud Enforcement and Recovery Act (FERA) amendments are consistent with their understanding of Cephalon's obligations under the CIA. See Dkt. No. 126-1 at ECF 8 n.2 (stating "the law before and after the amendment is the same"); Dkt. No. 128 at ECF 11-12 (arguing the FERA amendments reinforce relators' understanding that contractual obligations are within the scope of the reverse false claims provision regardless of the contingency of the obligation). I do not accept relators' argument that Congress' addition of the language in § 3729(b)(3) stating an obligation exists "whether or not fixed" was meant to address contingent obligations. That phrase refers to "whether or not the amount owed was fixed at the time of the violation" rather than whether an obligation to pay was fixed. 1 John T. Boese, Civil False Claims and Qui Tam Actions § 2.01[L], 2-83 (2014) (emphasis in original) (discussing legislative history). Thus, the monetary amount of a contractual obligation need not be fixed for a present obligation to pay the government to exist under § 3729(a)(1)(G). Regardless, I agree that relators' third amended complaint states claims under both the pre-FERA reverse false claims provision § 3729(a)(7) and § 3729(a)(1)(G) for the reasons discussed below. I will only refer to § 3729(a)(1)(G) throughout for ease of reference.

contained in their third amended complaint (Dkt. No. 126), relators' response (Dkt. No. 128) and Cephalon's reply (Dkt. No. 130). For the following reasons, I will deny Cephalon's motion.

**BACKGROUND**

In September 2008, Cephalon entered into a corporate integrity agreement (CIA) with the federal government. The CIA provides that Cephalon must notify the Office of the Inspector General (OIG) of the Department of Health & Human Services of any "reportable events" including any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program and/or applicable to any FDA requirements relating to the promotion of Cephalon products for which penalties or exclusion may be authorized." See Dkt. No. 121-1 at ECF 23, § III.H.1.a. Cephalon must also regularly certify that the company has an effective compliance program and is in compliance with all the applicable requirements set forth in the CIA. See id. at ECF 5, § III.A.3-4.

The CIA states that "as a contractual remedy, Cephalon and the OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of . . . monetary penalties." Dkt. No. 121-2 at ECF 6, § X.A. The OIG may "exercise its contractual right to demand payment" of the penalties by "demand letter" after "finding that Cephalon has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate." Id. at ECF 8, § X.C.1. Among the stipulated penalties the CIA provides are a $2,500 daily penalty for failure to implement the disclosure program, a $5,000 penalty for each false certification made pursuant to required annual reports and $1,000 daily penalties for

failure to fully comply with the obligations of the CIA.  See id. at ECF 7, § X.A.1.g, k; A.6; A.7.

On April 15, 2015, I granted in part Cephalon's motion to dismiss relators' second amended complaint having found that relators did not adequately allege a violation of an obligation to pay the federal government under § 3729(a)(1)(G) because relators did not specifically allege Cephalon violated an obligation to pay stipulated penalties under the CIA.  See Dkt. Nos. 118, 119.

Relators filed their third amended complaint on May 1, 2015.  See Dkt. No. 121.  Relators allege that Cephalon promoted Provigil and Nuvigil off label and paid unlawful kickbacks in violation of the CIA.  See id. at ¶¶ 385-404.  They allege that Cephalon did not report illegal kickback and off-label promotion schemes, and submitted false reports to the OIG.  Id.  The third amended complaint describes the requirements of the CIA, including the stipulated penalties, id. at ¶¶ 387-398, and details Cephalon's alleged breaches of the CIA.  See id. at ¶¶ 399-404, ¶¶ 120-256.  Relators allege these breaches entitled the OIG to collect the stipulated penalties as set forth in the CIA, but that Cephalon's failure to report and false certifications of compliance allowed it to improperly avoid its obligation to pay those penalties.  See id. at ¶¶ 394-398.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic

3

recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted). This "simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. Id. at 556. The Court of Appeals has made clear that after Ashcroft v. Iqbal, 556 U.S. 662 (2009), "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009), quoting Iqbal, 556 U.S. at 678. The Court also set forth a two part-analysis for reviewing motions to dismiss in light of Twombly and Iqbal:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."

Id. at 210-11, quoting Iqbal, 556 U.S. at 679. The Court explained, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Id., citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not

4

'show[n]'–'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679, quoting Fed. R. Civ. P. 8(a)(2).

## DISCUSSION

Section 3729(a)(1)(G) makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Conduct prohibited by § 3729(a)(1)(G) is known as a "reverse false claim" because "the action of the defendant results not in improper payment to the defendant from the Government, but rather no payment to the Government when payment is otherwise obligated." U.S. ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co., 668 F. Supp. 2d 780, 811-12 (E.D. La. 2009) (citations omitted). "A prerequisite for liability under [a reverse false claim] theory is a legal obligation" to pay or credit the government. U.S. ex rel. Quinn v. Omnicare Inc., 382 F.3d 432, 444 (3d Cir. 2004). Under the 2009 Fraud Enforcement and Recovery Act (FERA) amendments to the FCA, "obligation" is defined in § 3729(b)(3) as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment . . . ." 31 U.S.C. § 3729(b)(3).

Relators allege that Cephalon made reverse false claims in violation of § 3729(a)(1)(G) by falsely certifying compliance with the CIA's reporting requirements in order to avoid its obligation to pay stipulated penalties under the CIA. Cephalon

5

argues that it incurs an obligation to pay stipulated penalties under the CIA only if the OIG decides to demand payment of the penalties. Since relators do not allege the OIG has demanded payment of penalties under the CIA, Cephalon contends that relators have failed to state a claim under § 3729(a)(1)(G). Relators contend that Cephalon's obligation to pay the stipulated penalties arises when Cephalon breaches the CIA's reporting and certification requirements and not when the OIG demands payment.

As a threshold matter, "stipulated penalty provisions are construed as contractual obligations." United States v. Jupiter Aluminum Corp., No. 07-262, 2009 WL 418091, at *7 (N.D. Ind. Feb. 18, 2009). While there is a conceptual distinction, the Supreme Court has not placed "critical reliance on the distinction between obligation and remedy." City of El Paso v. Simmons, 379 U.S. 497, 508 (1965). "Faced with the theoretical distinction between contract rights and remedies, the Court [has] viewed contract rights and obligations synonymously." Samuel R. Olken, Charles Evans Hughes and the Blaisdell Decision: A Historical Study of Contract Clause Jurisprudence, 72 Or. L. Rev. 513, 526 (1993).

Courts have "struggled to define when exactly defendants have an 'obligation' to pay funds to the Government." Robert Salcido, The 2009 False Claims Act Amendments: Congress' Efforts to Both Expand and Narrow the Scope of the False Claims Act, 39 Pub. Cont. L.J. 741, 742-43 (2010). There appears to be agreement about two propositions. First,

> a defendant does not execute a reverse false claim by engaging in behavior that might or might not result in the creation of an obligation to pay or transmit money or property to the government. Contingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the statute.

Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc., 190 F.3d 729, 738 (6th Cir. 1999); see Zelenka v. NFI Indus., Inc., 436 F. Supp. 2d 701, 706 (D.N.J. 2006) (finding obligation to pay inspection fees was contingent upon government agency's decision to inspect shipments and that it was therefore not an obligation under the reverse false claims provision), aff'd, 260 F. App'x 493 (3d Cir. 2008). Second, "[t]here is broad agreement that a breach of contract can give rise to an 'obligation' under the Reverse False Claims Act." Ruscher v. Omnicare Inc., No. 08-3396, 2014 WL 4388726, at *5 (S.D. Tex. Sept. 5, 2014) (collecting cases); see also U.S. ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189, 1204 (10th Cir. 2006) (stating a "contractual obligation falls within the scope of" the reverse false claims provision); Am. Textile, 190 F.3d at 741 (stating "'obligation' certainly includes those arising from acknowledgements of indebtedness, final judgments, and breaches of government contracts"). The statutory definition of obligation states that it includes a "duty" arising from an "express or implied contractual" relationship. 31 U.S.C. § 3729(b)(3).

In U.S. ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co., 668 F. Supp. 2d 780, 811-12 (E.D. La. 2009), the District Court found that to fall outside of the scope of the reverse false claims provision obligations must be "potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed . . . and which do not arise out of an economic relationship between the government and the defendant." Id. (emphasis added), citing U.S. ex rel. Marcy v. Rowan Companies, Inc., 520 F.3d 384, 391 (5th Cir. 2008). The District Court defined a contractual obligation as one arising "out of an economic relationship between the government and the defendant (such as a lease or a contract or the like) under which the government provides some

7

benefit to the defendant wholly or partially in exchange for an agreed or expected payment or transfer of property by (or on behalf of) the defendant to (or for the economic benefit of) the government." Branch, 668 F. Supp. 2d at 811-12. The District Court found that the qui tam relator in that case had not stated a claim under § 3729(a)(1)(G) in part because he had not shown that there was a relationship in which the government provided some benefit to the defendant in exchange for payment. Id.

Cephalon's argument only succeeds if it can distinguish the obligation to pay stipulated penalties under the CIA from other contractual obligations that give rise to claims under § 3729(a)(1)(G). Cephalon could potentially distinguish the CIA in two ways: (1) by arguing that the CIA creates a more contingent obligation than contractual obligations within the scope of the reverse false claims provision; or (2) contending that the CIA's obligations are substantively distinct from "an economic relationship between the government and the defendant" based upon the exchange of some benefit for some agreed or expected payment similar to the reasoning of the Court in Branch. In prior briefing, Cephalon alluded to the second argument when it stated that the CIA is "not an agreement to provide goods or perform services for the government," Dkt. No. 105-1 at ECF 25, but it has not argued the CIA does not "provide[ ] some benefit" to Cephalon "in exchange for an agreed or expected payment . . . to the government" in the form of the stipulated penalties. Branch, 668 F. Supp. 2d at 811-12. These issues have not been squarely considered or argued by the parties and so I will decline to decide Cephalon's motion on that basis.[2]

---

[2] I will note here, however, that the OIG defines a CIA as a negotiated agreement in which "entities agree to the obligations" in the CIA "and in exchange, OIG agrees not to seek their exclusion from participation in Medicare, Medicaid, or other

Instead, Cephalon pursues the argument that it does not incur an obligation to pay stipulated penalties upon breach of the CIA because the assessment of those penalties is contingent on the exercise of the OIG's discretion. See Dkt. No. 126 at ECF 5. Two courts have expressly considered whether a company's failure to comply with a CIA involving the same relevant terms as Cephalon's CIA created an obligation to pay stipulated penalties to the OIG as the basis for a claim under § 3729(a)(1)(G) and reached opposite conclusions. In U.S. ex rel. Booker v. Pfizer, Inc., No. 10-11166, 2014 WL 1271766 (D. Mass. Mar. 26, 2014), the District Court found that when penalties for violating a CIA are only "potential fines [that] depend on intervening discretionary governmental acts, they are not sufficient to create obligations to pay" and therefore are not actionable under § 3729(a)(1)(G) until they are demanded, regardless of the contractual nature of the obligation. The District Court explained that the "discretion retained by the OIG here is thus the discretion whether to impose a penalty and thereby create an obligation to pay, rather than the discretion whether to enforce an existing obligation to pay the government." Booker, 2014 WL 1271766, at *10 (emphasis in original). Under the logic of Booker, it is the terms of the penalty provision in the contract itself that determine if the contract creates a present obligation upon breach. For example, a party "incurs the obligation to pay a penalty when its conduct falls below specific contractual obligations, and when there is a contractual provision specifying that such conduct will incur a penalty." United States v. Merck-Medco Managed Care, L.L.C., 336 F. Supp. 2d 430, 445 (E.D. Pa. 2004) (emphasis added) (finding violation of

---

Federal health care programs." Office of the Inspector General, Corporate Integrity Agreements (July 4, 2015), https://oig.hhs.gov/compliance/corporate-integrity-agreements/.

9

a CIA's penalty provision created an "obligation" to pay under the reverse false claims provision at the time of the violation where the agreement provided that such penalties "shall" be incurred upon violations of the agreement). Following Booker, as Cephalon argues, where the language of the CIA itself creates contingency by providing for the government's exercise of discretion, I should not allow the "contractual nature of the penalties" to "end[ ] the analysis without taking the essential next step of determining whether the CIA" creates an established rather than a contingent duty to pay the government. Dkt. No. 109 at ECF 15.

In contrast, in Ruscher v. Omnicare Inc., No. 08-3396, 2014 WL 4388726, at *5 (S.D. Tex. Sept. 5, 2014) the Court was "convinced that the contract makes a difference" since the "decision by the OIG that Stipulated Penalties are 'appropriate' is identical to the decision by any contracting party to sue for a breach" and that therefore concealing a violation of the CIA could give rise to liability for reverse false claims under the FCA before the OIG demanded payment. Ruscher, 2014 WL 4388726, at *5. The District Court reasoned that Booker had relied upon cases finding that assessment of statutory penalties arising from violations of statutory duties could not give rise to reverse false claims liability rather than considering penalties arising from the violation of contractual obligations such as those under the CIA. Id. At first, it seems that in Ruscher "the emphasis is not so much on the timing of the obligation as on its source" because it distinguishes Booker on the grounds that Booker relied primarily on regulatory and statutory penalty cases in reaching its conclusion about obligations under the CIA. U.S. ex rel Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods, Inc., 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005) (emphasis in original). For that reason, Cephalon contends the

Court in Ruscher erred in not "taking the essential next step" of considering the contingency of the obligation under the language of the CIA. Dkt. No. 109 at ECF 15.

While the source of the obligation is contemplated by § 3729(b)(3), the contractual nature of the stipulated penalties makes a difference precisely because it informs the question of the timing of Cephalon's obligation to pay. The existence of a contractual obligation to pay does not typically depend upon the timing of the demand for payment. In U.S., ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp., No. 04-01224, 2009 WL 3161828, at *6 (D. Colo. Sept. 30, 2009) the Court held that the duty to pay "regular royalties under a valid, contracted federal lease" are not outside the scope of the reverse false claims provision "in the absence of an order" from the government to pay under the lease. The Court reasoned that "[j]ust as with any other [contract], were [the defendant] not to perform its duties for the term of the contract, it would be subject to liability" and thus it rejected the defendant's "attempts to characterize its duties to the government as arising out of [the government's] decision whether to issue payment orders . . . ." Id.

Similarly, as a general matter a debt "is matured, payable on demand, or payable on order if it is presently payable . . . ." In re Irwin, 509 B.R. 808, 815 (Bankr. E.D. Pa. 2014). That is because "one agrees to pay 'on demand' obligations that are presently due . . . ." Feucht v. Keller, 104 F.2d 250, 252 (D.C. Cir. 1939). For example, "[t]he promise of the restaurant that, after the sale of the assets, it would pay the notes on demand, obviously made the notes demand obligations from the date of the sale. A promissory note payable on demand is a present debt, payable without any demand . . . ." Id. (internal citations omitted); see 71 A.L.R.2d 284 (1960) ("It appears to be well-settled that a promissory note payable 'on demand' is due immediately without a demand.").

The District Court's conclusion that there was an established obligation to pay the government under the CIA in Ruscher is also supported by United States ex rel. Landis v. Tailwind Sports Corp., 51 F. Supp. 3d 9 (D.D.C. 2014). In Landis, the government and an ex-teammate relator alleged that Lance Armstrong and associated entities had engaged in doping in violation of sponsorship agreements with the U.S. Postal Service. Id. at 26. The plaintiffs brought claims under the reverse false claims provision, alleging that defendants concealed and failed to inform USPS about their violation of the sponsorship agreement's terms prohibiting doping in order to continue receiving payments under the agreement and avoid any obligation to reimburse the government. Id. at 26, 55. The issue before the District Court was whether a "breach of the sponsorship agreements due to the riders' doping impose[s] an 'obligation' to reimburse the government for money previously awarded under the contract." Id. at 55.

The District Court "reject[ed the] defendants' argument that, even if a breach of contract created an 'obligation,' it was a contingent obligation because the government had discretion in deciding whether to seek repayment," explaining that "the Postal Service clearly could have sought restitution—repayment of the sponsorship fees—as a remedy. Consequently, under both agreements the defendants owed 'the government an obligation sufficiently certain to give rise to an action of debt at common law.'" Id. at 58, citing Am. Textile, 190 F.3d at 736. The District Court concluded that the plaintiffs had stated a claim under the reverse false claims provision because the "defendants owed an obligation to pay money to the government due to the alleged breach of the sponsorship agreements as a result of the riders' doping." Id. at 60.

Similarly, Cephalon's

12

> argument proves too much. A party to a contract that has allegedly been breached always has 'discretion' as to whether to seek remedy for the breach; parties to a contract are not required by law or custom to sue each other for every breach. Thus, accepting the defendants' argument would mean that a breach of contract could never be an 'obligation' until a formal demand was made or a lawsuit was initiated, a result that cannot be squared with the language or the purpose of the statute.

Id. at 58. Accordingly, Cephalon's obligation to pay stipulated penalties under the CIA cannot be construed as arising only when the OIG demands payment of those penalties.

Indeed, the CIA arguably creates a much less contingent obligation to pay than other contractual relationships because it provides for stipulated penalties in the event of a breach. Unlike in Landis, where the District Court considered whether the government "could have sought restitution—repayment of the sponsorship fees—as a remedy" here Cephalon and the government have already negotiated and contracted for the remedies that arise upon a breach of the CIA. Id. At least one pre-FERA court that was hesitant to find a cause of action under the reverse false claims provision arising from a breach of contract reasoned that "I may breach a contract, but absent a specific remedy provided in the contract, I have no obligation to pay or transmit money to the other contracting party until he obtains a judgment." U.S. ex rel. S. Prawer & Co. v. Verrill & Dana, 946 F. Supp. 87, 95 (D. Me. 1996). Thus the Court held "[m]oney is not 'owed' without a specific contract remedy, a judgment or an acknowledgment of indebtedness." Id. Even under that restrictive reasoning, the existence of a "specific contract remedy" in the form of stipulated penalties was understood to create an obligation within the scope of the reverse false claims provision because it creates a less contingent obligation to pay than other kinds of contractual obligations where enforcement requires formal litigation to final judgment. Id.

In Bahrani, the Court of Appeals for the Fifth Circuit noted that "government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform," but that a contractual obligation "falls within the scope of [the reverse false claims provision]." 465 F.3d at 1204. I agree with the District Court's conclusion in Ruscher that a "decision by the OIG that Stipulated Penalties are 'appropriate' is identical to the decision by any contracting party to sue for a breach," 2014 WL 4388726, at *5, and "disagree with" Cephalon "that the discretion afforded to [OIG] officials to determine whether" to demand payment of stipulated penalties under the CIA "renders the obligation contingent and thus outside the scope of [the reverse false claims provision]." Bahrani, 465 F.3d at 1203. I find that Cephalon's contractual obligation to pay the government is an "established duty" as contemplated by § 3729(b)(3) upon breach of the CIA's relevant requirements and that therefore relators have stated a claim under § 3729(a)(1)(G).

## CONCLUSION

For the reasons set forth above, I will deny Cephalon's motion to dismiss relators' § 3729(a)(1)(G) claims.

An appropriate Order follows.